IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLORIA BANNON AND                        )
    JACQUELINE BURTON,                   )
                              )
        Plaintiffs                          )        No. 04 C 3081
                              )
        v.                                   )        The Honorable William J. Hibbler
                              )
THE UNIVERSITY OF CHICAGO,                )
                              )
        Defendant.                          )

## MEMORANDUM OPINION AND ORDER

Two former employees, Gloria Bannon and Jacqueline Burton, sued the University of Chicago, alleging that they faced discrimination at the Argonne National Laboratory, which the University operated. Argonne moves for summary judgment.

## I. FACTUAL BACKGROUND[1]

---

[1] The Court struggled to complete the factual background because both parties submitted woefully inadequate 56.1 Statements. The parties often fail to include in the record materials which they cite in their Statements. They fail to include pages of the deposition surrounding the specific pages in which support for their statements are found, depriving the Court of the context necessary to determine the accuracy of their statements. They consistently mischaracterize, and sometimes misrepresent, the facts contained in the materials they cite. They inject argument into their materials and quibble over facts that are not material. They dispute facts that are not genuinely in dispute, as well as argue for the absence of a dispute over facts that clearly are disputed. The Court here, and throughout this opinion, provides examples of the errors that make plain the inadequacy of the parties' 56.1 materials. Defendant alleges Bannon authored a card in which she refers to Reilly as a "great boss," citing "Bannon Dep., Ex. 27, at D008856-57." But Exhibit 27 to Bannon's Deposition is Bates-stamped D000023 and is a facsimile sent by Plaintiff's counsel to Defendant's counsel. Bannon suggests that "Reilly told Bannon not to apply for the 604-level position and that he would not allow her to be promoted." (Pl. Statement ¶ 35). In support, Plaintiff cites to Bannon's Deposition, page 89, line 319 and page 95, line 17 through page 97, line 9. But Bannon does not include those pages of her deposition in her 56.1 materials. Bannon routinely admits the factual content of a given document but then injects her

1

## A.    *Gloria Bannon*

Gloria Bannon began working for Argonne in 1976 as a "Secretary I." (Def. 56.1(a) Statement of Facts (Def. Statement) ¶ 178). By 1989, Bannon had advanced to the position of executive secretary, which at that time Argonne classified as a grade 109 position.[2] (Def. Statement ¶ 180). Christopher Reilly, director of Argonne's Environmental Research Division (ER Division), hired Bannon for the executive secretary position, which was the highest available secretary position at Argonne. (Def. Statement ¶¶ 26, 180-81). Between October 1989, when Bannon received her promotion to executive secretary under Reilly and November 2002, when Bannon received another promotion, Bannon received 12, nearly annual, merit-based salary increases. (Reilly Aff. ¶ 33, Ex. 8). In addition, beginning in 1997 and continuing through 2002, Bannon received annual performance bonuses and recognition that she had performed significantly beyond her job expectations. (Reilly Aff. ¶ 34, Exs. 8, 10). By April 2002, Bannon's salary was 11.27% higher than

---

own interpretation of the mental state of the author of the document. This is argument, and not appropriate for the 56.1 statement. On the other hand, Defendant in an exercise of what the Court can only describe as sheer pettiness includes a "response" to each and every subject heading in Plaintiff's statement that reads "This is not a valid fact statement to which a response is required." Defendant does so even though it used subject headings in its own statement of facts. Such trite contentiousness is not becoming, and serves only to make more burdensome the Court's task of sorting through the undisputed facts. In sum, the materials submitted by both parties are overly cumbersome, incomplete and riddled with error. The Court will not sort through the 588 numbered paragraphs individually to determine which paragraphs it should strike, and all motions to strike are denied. Instead, it relies only upon facts, and not argument, and only those facts for which it finds support. The Court encourages both parties in future cases to more carefully compile their 56.1 materials.

[2] At some point, Argonne reclassified Bannon to a grade 110 position.

other Argonne executive secretaries and 8.90% higher than other Argonne Staff Assistants. (Bannon Dep., Ex. 6)[3]

Bannon admits that she and Reilly were "personal friends," and that Reilly invited her to several social functions a year. (Bannon Dep. at 139). In fact, in May 1998, Bannon and her husband, took a vacation with Reilly and his wife, where they shared a car driving along the east coast of Canada for seven days. (Bannon Dep. at 140-41). Bannon also admits that she enjoyed Reilly's company. (Bannon Dep. at 141).

At the same time, beginning in 1997, Bannon claims that she sought to be promoted to a supervisory position, with a grade of 604 or 605. (Bannon Dep. at 93-100). According to Bannon, Reilly discouraged her from applying for such positions because she could make more money in her grade 100 position with the overtime she was earning working for Reilly. (Bannon Dep. at 93-94). Bannon informed Reilly that she was less interested in money and more interested in advancing her career by assuming a supervisory position, and yet she never applied for any of the available positions. (Bannon Dep. at 93-100).

Around 2001, Reilly approached Bannon and requested that she take an additional assignment to help co-Plaintiff Burton in the Applied Geosciences & Environmental Managment (AGEM) Section of the ER division. (Bannon Dep. at 100-101). Reilly requested that human resources reclassify Bannon to a grade 605 position, acknowledging the added responsibility she

---

[3] Bannon objects to the foundation for this exhibit, arguing that "Reilly has not established that he is qualified to make averments concerning the substance of [the] document." Argonne responds by pointing out that Reilly avers that he is the Director of Argonne's Environmental Research Division and that he has personal knowledge regarding the matters contained within his affidavit. But neither side seems to notice that the material cited by Argonne is not drawn from Reilly's affidavit but from Exhibit 6 to *Bannon's* deposition.

would have working for Burton. (Bannon Dep. at 114-15). Human resources, however, refused to classify the position as a grade 605 or 604 position — and would authorize only a change to grade 602, which would cause Bannon to lose overtime pay. (Bannon Dep. at 114-15). As a result, Bannon was reluctant to accept the assignment because of the increased workload. 9Bannon Dep. at 101-103). Nonnetheless, Bannon accepted the assignment, but did not accept the promotion to grade 602 (presumably so that she could still collect compensation for overtime pay). (Bannon Dep. at 101-103). Disappointed, Bannon wrote a memorandum to Reilly protesting the decision by Human Resources to downgrade the position from a grade 604 position to a grade 602 position. (Bannon Dep., Ex. 6). Reilly then requested that Argonne's Compensation Department reclassify Bannon as an "Administrative Specialist." (Bannon Dep., Ex. 5). After he received a memorandum from a compensation specialist at Argonne's human resources department, Reilly recommended that Bannon receive a near 7% raise because she had been handling duties beyond those normally required for her position. (Bannon Dep., Exs 5-6).

In September 2002, Bannon applied for a grade 604 position as a project management analyst for co-Plaintifff Burton. (Bannon Dep. at 131-133). According to Bannon, Reilly attempted to dissuade her from applying for the position, informing her that her salary would decrease because at a level 600 position she would no longer be entitled to receive overtime compensation. (Bannon Dep. at 93). Bannon nevertheless applied for the position. (Bannon Dep. at 154). After Burton informed Reilly that she desired to hire Bannon for the position, Reilly submitted a letter to human resources requesting that it approve Bannon's promotion. (Bannon Dep., Ex. 19). Reilly also sent Bannon a "thank you" letter for the work she had done after she received the promotion. (Bannon

4

Dep., Ex. 22). Bannon's promotion became effective on November 1, 2002. (Reilly Dep. at 182). Bannon received an 11.7% increase in salary due to her promotion. (Bannon Dep., Ex. 2).

When Bannon received her promotion, Jacqueline Burton became her supervisor. (Bannon Dep. at 69). But a few months later, on January 16, 2003, Argonne terminated Burton, and Lorraine LaFreniere became Bannon's supervisor. (Bannon Dep. at 258, 263-64). On January 20th, LaFreniere met with Bannon and told her that her position would remain the same as it was before Burton's departure. (Bannon Dep. at 302). At the meeting, Bannon informed LaFreniere that she would assist her in any way she could. (Bannon Dep. at 304). After the meeting, LaFreniere distributed a memorandum to the AGEM Section employees informing them of the reorganization of the section, advising them that Bannon would assist her in the transition, and directing them to coordinate everything through Bannon. (Bannon Dep., Ex. 35). That same day, Bannon issued a memorandum informing AGEM staff of a meeting, for two days later. (Bannon Dep., Ex. 36). Nevertheless, Bannon believed that LaFreniere began to exclude her, conduct secret meetings, and reassign her work to other employees. (Bannon Dep. at 250-54, 273-74, 398-402).

But later on January 20th, Bannon had a confrontation with Mark Jones, Argonne's counsel. Jones requested interviews with the entire AGEM staff because he had received reports that some employees had been removing Argonne material from the premises. (Bannon Dep. at 309-11). When Jones confronted Bannon, claiming that she had been seen removing Argonne property on January 17th (the day after Burton's termination), Bannon informed him that she was instead transporting hand-me-down clothing that she was donating to a secretary she supervised. (Bannon Dep. at 320-22). The confrontation upset Bannon, and she attempted to contact both Reilly and LaFreniere. (Bannon Dep. at 318). When she was unable to reach either, Bannon left and later

5

requested vacation for the remainder of the week. (Bannon Dep. at 327, 334). Jones later requested a meeting with Bannon later that week, which she agreed to attend. (Bannon Dep. at 337-38). At the meeting, Bannon repeated her explanation for the accusations against her, and Argonne took no disciplinary action against her. (Bannon Dep. at 355, 361).

Bannon returned to the office on January 27, and met with LaFreniere. (Bannon Dep. at 380).[4] On February 19, Bannon left Argonne because she was sick and never returned. (Bannon Dep. at 415). Bannon remained on Argonne's payroll until July 14, 2003, receiving a raise and a bonus in March. (Bannon Dep. at 532 & Ex.2).

Bannon claims that she was unable to return to Argonne because of the hostile environment created by Reilly and others (though Reilly no longer supervised Bannon). Bannon points to six isolated instances where Reilly made derogatory remarks. He referred to her as a "wetback" at some point in the 1990s. (Bannon Dep. at 200). He called her a "brown cow" at some point in the 1990s. (Bannon Dep. at 199). In February 2001, he stated that he did not understand how her "Mexican brain" worked. (Bannon Dep. at 225). He suggested in late 2001 that she "swam across the border."

_____

[4] Defendant asserts in Paragraph 304 of its 56.1 Statement that Bannon testified that LaFreniere told her that she was not unsatisfied with her performance and that Bannon would play a critical role in the AGEM Section. Defendant cites only to page 380 of Bannon's deposition. But on page 380 of Bannon's deposition, Bannon testified that LaFreniere had placed Carol Rosignolo in charge, a point hardly consistent with Bannon playing a critical role in the AGEM Section. Bannon points out the inconsistency between her testimony and Argonne's statement of fact. Argonne confusingly suggests that Bannon's denial was non-responsive. First, as noted above, Bannon's response does tend to refute the fact asserted. Second, Defendant wholly fails to point to any support for the proposition that LaFreniere told Bannon that she would play a critical role in the AGEM Section. Third, Defendant deprives Bannon of the opportunity to respond to its statement because, in its reply, Defendant points instead to page 381 of Bannon's deposition as support for its statement. Fourth, Defendant fails to include page 381 of Bannon's deposition, depriving the Court of the ability to determine the accuracy of its factual statement. Defendant's 56.1 statement and reply to Plaintiff's response in this instance are characteristic of the problems that are endemic to the summary judgment materials.

(Bannon Dep. at 228). In August 2002, he suggested to Bannon that she was attempting to start a "Rainbow Coalition" because she recommended Argonne hire two African American secretaries. (Bannon Dep. at 228). And sometime in Fall 2002, he stated that her "Mexican brain" or "Mexican pea brain" could not understand budgets. (Bannon Dep. at 200, 230).

Bannon also believed that others at Argonne harrassed her. For example, Banon believed that Fran Coose taunted, harassed, and stalked her. (Bannon Dep. at 180-188). In October 2002, Bannon wrote a letter to Reilly accusing Coose of interfering with her work and spreading gossip and rumor about her. (Bannon Dep., Ex. 20). Bannon also sent an email to Reilly and an Argonne Human Resources personnel suggesting, without any direct evidence, that Coose had used a heavy-duty staple to flatten her tire. (Bannon Dep., Ex. 20). Bannon also believed that two other co-workers, Sharon Fisher and Jamie Hase plotted against her. For example, Bannon claims that Fisher and Hase unplugged a fax machine in order to induce someone to complain about her to Burton. (Bannon Dep. at 448). She also believed that Fisher destroyed computer files. (Bannon Dep. 443).

## B.   Jacqueline Burton

Jacqueline Burton began working for Argonne in 1986 as a grade 707 scientist. (Burton Dep. at 42-44, Burton Aff. ¶ 6). At some point in the 1990s, Burton became the AGEM section head.[5] In late 2000 or early 2001, Burton approached Reilly and expressed interest in a promotion to a level 709 senior scientist. (Burton Dep. at 19). Reilly believed Burton had a shot at such a promotion,

---

[5] Defendants claim Burton became section head in 1995, citing page 49 of Burton's deposition. But page 49 of Burton's deposition makes no mention of Burton's appointment as section head. Plaintiffs claim Burton became section head in 1993, but fail to reference any portion of the record whatsoever. Although this fact is not material, the parties' collective failure to direct the Court to the appropriate portion of the record in regard to this fact is yet another example of the poor quality of the summary judgment materials.

and encouraged her to apply. (Burton Dep. at 142-144; Reilly Aff., Ex. 3). And in a 2001 performance evaluation, Reilly gave Burton an exceptional overall rating. (Reilly Aff., Ex. 3). In that performance evaluation, which Burton signed, Reilly encouraged Burton to collect the documentation necessary to support a promotion to the position of senior scientist. (Reilly Aff., Ex. 3). Although Burton had submitted materials for promotions before, she never presented to Reilly a list of persons who would be able to write letters of reference on her behalf. (Burton Dep. at 494, Ex. 38).[6]

Around 1995, Burton became the Principal Invistigator of the USDA/CCC program at Argonne. (Burton Dep. at 49-50). Burton's husband, John Walker, also a scientist in the AGEM Section, also worked on the USDA/CCC program. (Burton Dep. at 63-64; Walker Aff. ¶ 10). Because of Walker's and Burton's marital relationship, Reilly, not Burton, supervised Walker. (Reilly Dep. at 21; Walker Aff. ¶ 11). In June 2001, Walker informed Reilly that he desired to reduce his hours and prepare for retirement. (Reilly Dep. at 219-220; Walker Aff. ¶ 13). In November 2001, Walker reduced his Argonne time by 25%. (Burton Dep. at Ex. 16).

---

[6] Defendant argues that it is undisputed that Reilly asked Burton to provide him with a list of references. Plaintiffs deny this statement, pointing to page 494 of Burton's deposition in which she clearly states that Reilly never asked for references. Defendant's reply that its "record citations adequately support the stated facts." (Def. Reply in Support of its 56.1 Statement ¶ 54). But clearly Burton's deposition places this fact in dispute (though not necessarily a material one), and whether the materials defendant cited support their asserted fact is not relevant to whether the fact is in dispute. Defendant also argues that Burton testified that the reason she did not submit her list of references was because "she had enough to do," citing page 19 of her deposition. But page 19 of Burton's deposition contains no such testimony. Page 21 of Burton's deposition suggests that she refused to "write up everything that [Reilly] was supposed to write up [in support of a promotion application.]" (Burton Dep. at 21). But even this deposition testimony does not support Defendant's assertion that Burton failed to give Reilly a list of references because "she had enough to do."

One month later, Walker began consulting with Air, Soil, & Water & Associates (ASW), which contracted with Argonne to perform sampling work for the USDA/CCC program. (Burton Dep. 82-87; Burton Dep. at Ex. 15). Walker did not, at the time, complete a Conflict of Interest Disclosure Certificate or an Outside Business Consulting Form. (Burton Dep. at Ex. 15). Burton completed a Conflict of Interest Disclosure Certificate in November 2001 in which she disclosed that her niece worked for ASW, but not that her husband had a pending consultancy with ASW. (Burton Dep. at Ex. 9). From December 2001 to November 2002, Walker worked approximately 40 hours per week for ASW, receiving $100 per hour. (Burton Dep. at Ex. 16). At one point, Walker speculated that ASW's contract included the ability to charge Argonne if he worked on the CCC program so long as ASW did not include his name. (Burton Dep. at Ex. 16). In total, Walker, Received $56,000 from ASW. (Burton Dep. at Ex. 18).

In August or September 2002, Fran Coose complained about Walker and Burton had failed to disclose a conflict of interest regarding their niece's employment with ASW. (Jones Dep. at 22-23, Drucker Aff. at Ex. 2). Argonne's counsel, Mark Jones, reviewed the allegations and concluded that the allegations regarding the potential conflict of interest regarding Burton's niece were credible. (Drucker Aff. at Ex. 2). During the subsequent investigation, Walker wrote a letter to Reilly admitting that he had performed consulting services for ASW, but had not completed the requisite disclosure form. (Burton Dep. at Ex. 10, 15; Drucker Aff. at Ex. 2). Shortly thereafter, Walker completed a conflict of interest disclosure form, but did not list the compensation he received from ASW. (Burton Dep. at Ex. 15).

On January 3, 2003, Reilly wrote to Harvey Drucker, the associate laboratory director for Argonne, and informed him that Walker had shown him an invoice and a check stub in the amount

of $4,000 that represented the "totality of compensation for any consulting work for ASW." (Drucker Aff. at Ex. 11, D008734). Based on the understanding that Walker's compensation from ASW was under the $10,000 threshold that Argonne considered a "financial interest," Reilly certified on January 3 that Walker had no unresolved conflicts of interest. (Burton Dep. at Ex. 11). On January 6, 2003, however, Reilly learned that Walker's total compensation from ASW had been $56,000. (Reilly Dep. at 219). Around the same time, both Jones and Drucker met with Burton regarding her knowledge of her husband's consulting work with ASW. (Burton Dep. at 217-22).

On January 15, 2003, Burton was instructed to set forth in writing her reasons for not completing a Conflict of Interest Certificate regarding her husband's work with ASW. (Burton Dep. at 249). The next day, Drucker concluded that Walker and Burton failed to disclose a significant conflict of interest and that Argonne should terminate them. (Jones Aff. ¶ 5). On January 16th, Argonne sent via courier a termination notice to Burton, signed by Reilly. (Burton Dep. at Ex. 5). Burton and Walker appealed their terminations to a committee comprised of Dr. Beverly Hartline, Dr. Robert Rosner, Michael Derbidge, and Jones; the committee rejected Burton's and Walker's appeals. (Jones Aff. at Ex. 1-3). Laboratory Director Hermann Grunder approved the committee's decision. (Jones Aff. at Exs. 4-5).

## II. Summary Judgment Standard

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All facts and inferences are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In

considering cross-motions for summary judgment, the Court must construe all inferences in favor

of the party against whom the motion under consideration is made. *Allen v. City of Chi.*, 351 F.3d

306, 311 (7th Cir. 2003). The party opposing summary judgment, however, must go beyond the

pleadings and set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477

U.S. at 250. And neither "the mere existence of some alleged factual dispute between the parties,"

*Anderson*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986), is sufficient to defeat such a motion. Further a party cannot manufacture a conflict by

submitting an affidavit that contradicts an earlier deposition. *Piscione v. Ernst & Young, L.L.P.*, 171

F.3d 527, 532 (7th Cir. 1999).

### III. Analysis

A.    Bannon's Claims[7]

Bannon raises three claims that Argonne discriminated against her because of her national

origin. First, Bannon claims that Argonne failed to promote her because of her national origin.

Second, Bannon claims that Argonne subjected her to an hostile environment. And third, Bannon

claims that Argonne constructively discharged her based on her national origin. Finally, Bannon also

claims that Argonne and its employees intentionally inflicted emotional distress upon her. None of

Bannon's claims have merit.

---

[7] Count One of the Complaint alleges gender-based discrimination. In its motion,
Defendant points out that there are no facts that even remotely suggest a gender-based claim and
that Bannon's counsel indicated that Bannon intends to withdraw this claim. Bannon made no
motion to withdraw the claim, but Bannon failed to respond to Defendant's argument regarding
her gender-discrimination claim. The Court agrees that nothing in the record indicates a gender-
based claim and considers Bannon to have abandoned any gender-based discrimination claim she
raised in her complaint.

*1. Failure To Promote*

Argonne first argues that, although Bannon alleged that an unnamed person undermined her efforts to receive a promotion, she failed to plead her promotion claim in her Complaint and therefore the Court should not reach its merits. Rule 8 requires that a party give her opponent fair notice of whether a valid claim is alleged and what it is. Fed. R. Civ. Pro 8; *Walker v. Benjamin*, 293 F.3d 1030, 1039 (7th Cir. 2002). A complaint that is so sparse that the opposing party or the court cannot intelligently discern the substance of a complaint fails to meet the requirements of Rule 8. *Richmond v. NationwideCassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995). Bannon's complaint is nearly devoid of any reference to being passed over for a promotion. In Count III, where she claims national origin discrimination, she refers only to an hostile environment claim and a constructive discharge claim. In laying the factual foundation of her claims, she makes two references to a desired promotion. (*See* Compl. at ¶¶ 20, 25). First, she claims that when she sought a promotion, Reilly's harrassment intensified. Second, she claims that when she requested overtime pay, Argonne investigated her even though the reason she requested the overtime pay was because she was not promoted. Neither of these factual statements would have alerted Argonne that Bannon desired to press a failure-to-promote claim.

But when issues that are not raised in the pleadings are tried (or pre-tried) by the parties, "'they shall be treated in all respects as if they had been raised in the pleadings.'" *Torry v. Northrup Grumman Corp.*, 399 F.3d 876, 878 (7th Cir. 2005) (quoting Fed. R. Civ. P. 15(b)); *see also Ryan v. Ill. Dep't of Children and Family Servs.*, 185 F.3d 751, 763 (7th Cir. 1999). Here, the parties asked extensive questions during depositions related to the promotion claim, made arguments regarding its merits in their summary judgment motions, and submitted evidence to the Court related

12

to the claim, making it clear that they considered it to be part of Bannon's case. Consequently, the Court shall consider the merits of Bannon's failure-to-promote claim.

A plaintiff seeking to prove that her employer failed to promote her because of her national origin can proceed under either the direct or indirect method. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 273 (7th Cir. 2004). Under the direct method, the plaintiff must produce evidence that either directly reveals the employer's discriminatory reason for its failure to promote or constructs a convincing mosaic of circumstantial evidence that provides a basis for an inference of intentional discrimination. *Id.* at 272. Racial epithets can provide circumstantial evidence when sufficiently connected to the decision — made by the decisionmaker, around the time of the decision. *Id.* Nonetheless, the circumstantial evidence must point directly to a discriminatory reason for the employer's actions. *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005).

Bannon received a promotion in November 2002. At the earliest, she began seeking a promotion in 2001,[8] when she began to assist Burton in the AGEM Section. During this time frame, Bannon can point to four derrogatory comments made by Reilly, none of which he made in conjunction with any discussion regarding a promotion. The undisputed facts also demonstrate that once Bannon began to assist Burton, Reilly spoke with human resources and asked that her position be classified as a grade 605 position. When human resources denied Reilly's request and after Bannon wrote him a letter complaining that Argonne undervalued her services, Reilly again went to bat for Bannon and secured for her a 7% raise. When a 604 position finally opened in Fall 2002,

---

[8] Although Bannon claims that she expressed interest in a promotion as early as 1997, she never applied for any promotions. Although she claims that Reilly discouraged her from applying, by stressing that she would make less money if promoted because she would become a salaried employee and lose her overtime pay, Bannon cannot connect Reilly's advice to any racial animus.

Reilly submitted a letter to human resources on Bannon's behalf requesting that it approve her promotion and, when Bannon received the promotion, Reilly sent her a thank you letter for the work she had done for him.

Against this backdrop, four isolated comments, made in a context unrelated to any discussion of a promotion, are insufficient to survive summary judgment. There is nothing suspicious about the timing of Reilly's remarks, he only made recommendations to other decisionmakers, and his alleged slurs were too scant and sporadic to construct a "convincing mosaic" of circumstantial evidence that pointed directly to a discriminatory animus. *See, e.g., Cerutti v. BASF Corp.*, 349 F.3d 1055, 1066 (7th Cir. 2003) (isolated remarks by participants on panel insufficient to establish convincing mosaic of circumstantial evidence).

And so Bannon must proceed under the indirect, burden shifting method. *Jordan*, 396 F.3d at 833. Here, Bannon must establish that: 1) she is a member of a protected class; 2) she is qualified for the position she sought; 3) Argonne rejected her from the position she sought; and 4) Argonne granted the position to a person outside the protected class who is similarly or less qualified than she. *Id.* Bannon cannot prevail under the indirect method because she cannot satisfy the third and fourth prong. Bannon never applied for a promotion (other than the one she received) and so cannot show that Argonne rejected her from any promotion. In fact, Bannon actually rejected one promotion offered by Argonne. Nor can Bannon show that some other person not of Mexican national heritage received a promotion that she had sought. Her failure to promote claim, therefore, must fail.

2.     *Hostile Work Environment*

Bannon's hostile work environment claim merits little discussion. Over the course of 13 years, Bannon points to six isolated, albeit derogatory, remarks that Reilly allegedly made about her

national origin.[9] All but one of these remarks occurred more than 300 days prior to the filing of her EEOC complaint and therefore the Court shall not consider them. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 689 n.1 (7th Cir. 2005). Although Bannon now insists in an affidavit filed with her summary judgment materials that Reilly's comments were continuous and never-ending, she cannot manufacture a conflict with her deposition testimony with a self-serving affidavit. Moreover, even if the Court were to consider many of the remarks Bannon points to as timely, the fact that Bannon took a week-long vacation with Reilly and his family puts to bed the notion that her work situation was "hellish."[10] A plaintiff claiming a work environment is hostile must do more than point to a isolated comment that is not extraordinarily severe. *See, e.g., Racicot v. Wall Mart Stores, Inc.*, 414 F.3d 675, 677-78 (7th Cir. 2005); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995). While it is true that when considering ethnic slurs there is no "magic number" of comments that a plaintiff must establish, a plaintiff must show sufficiently severe or pervasive comments to create a hellish atmosphere. *Ezell v. Potter*, 400 F.3d 1041, 1048. Here, within the allowable time-period, Reilly referred to Bannon as having a "Mexican pea brain." While Reilly's alleged comment is offensive, it does not rise to the level required to demonstrate an hostile environment.

3.    *Constructive Discharge*

Next, Bannon claims that Argonne constructively discharged her. This claim also merits little discussion. To prevail on a constructive discharge claim, a plaintiff must show not only that

---

[9] Bannon also points to other acts of Reilly's, such as discouraging her from seeking a promotion. But as noted earlier she can connect none of these acts to her national origin.

[10] Although Bannon claims that the only reason she agreed to go on the vacation was because of her fear of retaliation, the facts that Bannon points to in order to support that "fear" occurred *after* the alleged vacation.

15

defendant's conduct was so severe and pervasive that it altered the conditions of her employment, but also that the working environment was "so intolerable that her resignation became a fitting response." *Pennsylvania St. Police v. Suders*, 542 U.S. 129, 133-34, 14 S. Ct. 2342, 159 L.Ed 2d 204 (2004). An hostile working environment is therefore a predicate to a constructive discharge claim, but the conditions faced by the employee must be even more egregious than those necessary to support an hostile environment claim. *Id.* at 149. Here, Bannon cannot even demonstrate that she faced an hostile environment, and thus cannot demonstrate that her resignation was a fitting response. Further, even if Reilly's comments created a hostile environment, Bannon received a promotion in November 2002 and no longer worked for Reilly, but for Burton (and later LaFreniere). And beginning in February 2003, she took a five-month leave of absence (during which she actually received a bonus and a raise), and then resigned, never returning to Argonne. She can demonstrate no allegedly discriminatory acts that occurred *after* she received her promotion in November 2002 until July 2003 when she resigned, a period of nearly nine months. She complains generally about vague conspiracies and harrassment, suggesting that LaFreniere began to take duties away from her in January 2003, shortly before Bannon took medical leave. While it is true that deprivation of job duties can support a constructive discharge claim, the deprivation must be severe and it must be tied to a forbidden animus. *See Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir.1984) (police officer forced to sit in windowless office that used to be a storage room and given no duties). Bannon points only to a couple of duties that were reassigned to Carol Rosignolo and makes no claim that Argonne essentially stripped her of all job duties. Further, Bannon makes no attempt whatsoever to tie LaFreniere's acts to any discriminatory animus. Bannon's constructive discharge claim is frivolous.

16

### 4.    *Intentional Infliction of Emotional Distress*

Bannon's intentional infliction of emotional distress claim is preempted by the Illinois Human Rights Act. Although discrimination and intentional infliction of emotional distress are different wrongs, and thus not necessarily preempted, *see Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006), if the core of the plaintiff's theory is that she was subject to discrimination, the IHRA preempts such claims, *Smith v. Chicago Sch. Reform Bd.*, 165 F.3d 1142, 1151 (7th Cir. 1999). Here, Bannon's intentional infliction of emotional distress claims rest on her theory that she was subject to Reilly's national origin discrimination. Although she points vaguely to other acts by employees (such as her speculation that a fellow employee stapled her tire or that Argonne employees were plotting against her by unplugging her fax machine), these acts are not, as a matter of law, so extreme and outrageous as to rise to the level necessary to sustain an intentional infliction of emotional distress claim.

### B.    Burton's Claims

Jacqueline Burton's claims fare no better. Burton claims that Argonne subjected her to an hostile environment based on her gender, failed to promote her because of her gender, and retaliated against her because she blew the whistle on improper allocation of funds. None of Burton's claims have merit.

### A.    *Hostile Environment*

Burton bases her claim that Argonne created an hostile environment on the fact that Reilly referred to her as a "dyke" and a "bitch" and claimed that her marriage to Walker was a sham. But in her deposition, Burton testified that Reilly never made a single offensive or derogatory comment to her. (Burton Dep. at 398). Instead, Burton heard about Reilly's alleged remarks from Bannon.

17

(Burton Dep. at 399). These alleged remarks occurred in a single, isolated conversation between Bannon and Reilly, regarding Bannon's desire to apply for a promotion to become Burton's secretary. (Bannon Dep. at 135-136). Further, Burton cannot recall whether she even learned of the remarks before her termination. (Burton Dep. at 399-400). Given that Reilly made the alleged remarks outside of Burton's presence and given that Burton points to no other evidence of gender-discrimination, the single, isolate comments by Reilly cannot form the basis of an objectively hostile work environment. *See, e.g., Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005); *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir.2005); *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir.1998); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938 n. 8 (7th Cir. 1996). Burton's hostile environment claim therefore fails.

## B. Failure To Promote

Burton's failure-to-promote claim turns on Burton's failure to provide a list of references to Reilly. The parties bicker over whether Reilly specifically asked Burton for a list of references. And while that fact may be in dispute, it is not material. Burton's argument that Reilly never asked her for references is a distraction. Burton had previously applied for promotions, in which she had supplied references. Burton also had access to and was aware of Argonne's requirements to be promoted to senior scientist positions, one of which was that it required a list of seven non-Argonne employees to peer review the applicant's qualifications. Argonne does not have a responsibility to compile Burton's promotion materials for her and in any event would have no way to determine which of Burton's peers outside of Argonne she would wish to utilize in support of her bid for a promotion. Burton simply failed to submit a list of references and therefore cannot demonstrate that she even applied for a promotion, let alone that Argonne rejected her or that it treated similarly

18

situated employees outside the protected class more favorably. To hold otherwise would place an onus on employers to actively seek out information from their employees whenever an employee expressed interest in a promotion.

## C.    Retaliatory Discharge

Burton's final claim is that Argonne retaliated against her once she and Bannon began investigating some alleged discrepancies in the purchase of furniture. This claim is perhaps the most fanciful. Burton argues that sometime in September or October 2002, she met with Reilly to discuss Bannon's promotion, and at that meeting she raised questions about some furniture requisitions made by other Argonne employees. (Burton Dep. at 160-165). Shortly after that, Reilly supported Bannon's promotion, but then launched a retaliatory campaign against the two of them for snooping into potential misallocation of funds by *other* Argonne employees. This conspiracy-theory lacks any reasonable factual or even logical foundation, and the Seventh Circuit has repeatedly rejected similarly fanciful theories. *See, e.g., Davis v. Con-Way Transp. Central Express, Inc.*, 369 F.3d 776, 785 (7th Cir. 2004); *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002).

Further, Argonne offered a perfectly legitimate non-retaliatory reason for Burton's discharge — her failure to disclose her husband's outside consulting work. Burton quibbles with Argonne's interpretation of its conflict-of-interest policy, but the Court's task is not to evaluate the wisdom of Argonne's policies, but instead only to assess whether Argonne lied about its reason for firing her. *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 824 (7th Cir. 2006); *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005). Burton points half-heartedly to Reilly's report that Walker had "no unresolved conflicts of interest." But that report was based upon Reilly's understanding that Walker's compensation for his consulting was under $10,000. Burton comes

19

forward with no other evidence to suggest that Argonne's application of the conflict-of-interest

policy was pretextual. In fact, throughout her deposition, Burton refused to provide any testimony

in response to questions about the policy, instead choosing to invoke her Fifth Amendment privilege

against self-incrimination. Burton's retaliatory discharge claim is without merit.

The Court grants summary judgment to Defendant on all counts.[11]

IT IS SO ORDERED.

6/16/06
Dated

Wm. J. Hibbler

The Honorable William J. Hibbler
United States District Court

---

[11] Defendant moves for sanctions against Plaintiffs under Rule 11. The Court has
considered Defendant's motion, but finds that Plaintiffs' claims, though lacking support, are not
frivolous. The Defendant *buried* the Court in a mound of largely irrelevant and poorly compiled
materials in defense of Plaintiffs' claims. But a frivolous complaint would not need 588
numbered paragraphs to resolve. Further, an award of sanctions under Rule 11 is subject to the
Court's discretion, and given Defendant's litigiousness and the inadequacy of its 56.1 materials,
the Court would deny the motion even if it found Plaintiffs' claims to be frivolous.